## **AFFIDAVIT**

I, Nicholas Nimeskern, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows:

1.  I am a TFO with DEA in the Cincinnati Resident Office (RO) and have been since 2020. I have been a police officer since 2005 and am currently employed with the City of Montgomery Police Department. I was previously assigned to D.A.R.T. Drug Abuse Reduction Task Force for several years prior to being assigned to the DEA. As a TFO with the DEA, my duties include the investigation of violations of federal law concerning the importation, manufacture, possession, and distribution of controlled substances as defined by 21 U.S.C. § 841, including controlled substances such as heroin, fentanyl, cocaine, methamphetamine, marijuana, illicitly diverted pharmaceuticals, and other dangerous drugs.

2.  During my current assignment with the DEA, I have specialized in investigations involving narcotics trafficking and numerous criminal offenses, including those involved in this action. I have received specialized training on narcotics trafficking and money laundering from the DEA and have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. Since that time, I have primarily been assigned investigations dealing with the importation and distribution of illegal drugs, which includes cocaine, "crack" cocaine, heroin, fentanyl, marijuana, methamphetamine, crystal methamphetamine, and 3, 4-methylenedioxy-methamphetamine (otherwise known as MDMA or "Ecstasy"). During those investigations, I have conducted physical surveillance, electronic surveillance, and wire surveillance. I have also arrested numerous individuals for various drug violations and have spoken with numerous drug dealers, gang members, and informants concerning the methods and

practices of drug traffickers. These investigations have also included the unlawful importation, possession with intent to distribute and distribution of illegal substances, the related money laundering instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses. These investigations have resulted in the seizure of narcotics, arrests of suspects, their prosecution, conviction, and the seizure of large amounts of U.S. currency; seizure of real property; and have involved the use of confidential informants; undercover agents; the analysis of pen registers, trap and trace devices, and toll records; physical surveillances and the execution of search warrants and arrest warrants. I have also testified in grand jury proceedings, suppression hearings, jury trials, and have written reports and analyzed documents in the course of investigations.

     3.     I have learned through training and experience that drug traffickers and their couriers often fly on one-way tickets and usually do not make travel plans much in advance because they get last second information that the narcotics are ready or instructions and they have no idea how long the transaction will take.

     4.     This Affidavit sets forth the factual basis for the civil forfeiture of certain seized currency and is based on my personal investigation. It includes only the information necessary to provide a legal basis for civil forfeiture, not all information obtained during this investigation.

     5.     On March 3, 2022, agents from the DEA Cincinnati DO and detectives from the Cincinnati/Northern Kentucky Airport Police Department (Airport Police) received information that Jalen Brent was traveling from Cincinnati to Los Angeles on the following suspicious flight itinerary: he purchased his one-way ticket two days prior to travel, and he was traveling to a known source city/state. Brent also was known to the Airport Police due to his involvement in a prior airport seizure. In particular, DEA seized $70,161.00 during an airport interdiction on April

14, 2021; the currency was seized from a female and forfeited pursuant to 21 U.S.C. § 881(a)(6), and law enforcement identified Jalen Brent as the source of this seized currency.

6. I responded to the departure gate for Brent's flight on March 3, 2022, accompanied by TFO Eli Sautter and TFO Richard Bernecker. When Brent did not board the flight despite having checked in, we began walking around the airport looking for him. A gate agent made an announcement that a passenger by the name of Jalen Brent had left his wallet at the gate counter and asked him to return to the gate to retrieve it. TFA Sautter responded to the that gate to obtain a better description of Brent, and then, in the distance, law enforcement saw Brent near the information center and food court.

7. TFO Bernecker and I approached Brent and confirmed his identity. I explained to Brent that the other officers and I were part of an interdiction team looking for large sums of money and/or drugs related to narcotics trafficking and/or terrorism. I asked Brent if I could perform a search his person and carry-on suitcase, and Brent verbally consented to the searches.

8. I asked Brent how much currency, if any, he was traveling with, and Brent replied that he had around two thousand dollars. I asked Brent if he wanted to walk to an empty gate for privacy and Brent indicted that he would prefer that. After relocating to the empty gate, I searched Brent's carry-on suitcase and immediately upon opening it could see four PNC bank envelopes packed full of currency in the mesh zipper portion of the suitcase. I then asked Brent how much money he really was traveling with, and Brent stated, "maybe eight thousand."

9. When I opened the first PNC bank envelope and it was filled beyond capacity with $100 bills, I told Brent that he needed to be honest about the amount of money he had, and Brent then stated, "it's more like twenty thousand." I opened the other three envelopes, all of which were filled to capacity with a combination of $100 and $50 bills. I asked Brent why he

3

lied about the amount that he was traveling with, and Brent stated, "I don't know man."

10. Law enforcement also located a USPS shipping receipt next to the four PNC Bank envelopes in Brent's suitcase. The receipt was for a package weighing 7 pounds, which was mailed to a destination in Roseville, California, via Priority Mail on February 28, 2022, for a total of $110.99. Law enforcement attempted to intercept the package but were unsuccessful. When asked what was inside it, Brent did not want to answer. It is my belief that Brent mailed an undetermined amount of U.S. Currency, as it is common for individual's involved in illegal drug trafficking to carry some currency on them while traveling and also mail a portion of currency.

11. Brent indicated that the currency he was traveling with did not come from a bank. Upon questioning regarding his bank activity, Brent indicated that he banks with Commonwealth Credit Union Bank in New Jersey that he had maybe five hundred dollars in his bank account. When asked why the money was in PNC bank envelopes, Brent stated that his girlfriend banks at PNC. I asked Brent what he intended to do with the large sum of currency that he was carrying, and he replied that he was possibly going to buy a food truck. When asked if he had anything on his phone to verify that he was going to buy a food truck, Brent stated, "no I was just going to find one to buy when I get out there." I also asked Brent where he was staying when he arrived in Los Angeles, and Brent replied that he was going to figure it out when he got there.

12. In response to further questioning, Brent stated that he was employed at Toyota Tsucho in Georgetown, Kentucky, on the assembly line and that he had worked there for about five months. Brent did not have any proof of employment, such as a check stub. Brent also stated that he had worked at Hibbett Sports part-time for a few months in 2021. I asked Brent if he had filed taxes in the past several years, and he replied that he had not.

13. I questioned Brent regarding the source of the currency in his possession, and he

indicated that it was made up of money he had saved and some that he had inherited from his stepdad. Brent was not exactly sure how much he received after his stepdad died, but he thought it was around twenty thousand and told me that that he received it a year ago. When TFO Sautter later asked Brent when he received the alleged inheritance, Brent instead stated "a few months ago in October." I asked Brent if he could provide any proof of how or when he received his alleged inheritance and he indicated that he could not.

14.     I asked Brent if law enforcement could perform a search of his cell phone to make sure there were no messages and/or pictures related to illegal drug trafficking on it. Brent then stated that he had an emergency and needed to go to the bathroom. Brent was advised that he could use the bathroom but that agents needed his phone first. Brent then denied consent to search his cell phone. Brent ultimately never went to the bathroom during or after the seizure. I believe that Brent wanted to go to the bathroom so that he could delete any incriminating evidence on his phone.

15.     Brent's phone was seized as evidence and a state search warrant later was obtained for it. The search of Brent's phone revealed evidence that Brent was involved in illegal drug activity, including pictures and messages indicative of drug-trafficking.

16.     In total, $39,327.00 in U.S. Currency and was discovered and seized from Brent. Brent was traveling alone and was the only person other than law enforcement present at the time of the search and seizure After its seizure, the currency was examined by a drug-detecting dog, who showed a positive indication for narcotic odor thereon.

17.     Several factors established probable cause to believe that the currency seized from Brent was proceeds of illegal drug trafficking or intended to be furnished in exchange for illegal drugs, including but not limited to the following:

    a. Brent's travel to a known source city/state with a large amount of cash on a one-way airline ticket purchased two days prior;

    b. Brent admitting that he has not paid taxes in the past several years and his inability to show any proof of employment;

    c. Brent's vague and unsupported explanation of the source of the seized currency, indication that it did not come from a bank, inability to show any proof of maintaining a bank account, and statement that he only had around $500 in his account;

    d. Brent's repeated inconsistent statements regarding the amount of cash that he was traveling with;

    e. Evidence on Brent's cell phone indicative of drug trafficking;

    f. The positive alert by a drug-detecting dog on the seized currency; and

    g. Brent's prior involvement with another airport seizure.

18. DEA commenced administrative forfeiture proceedings against the $39,327.00 in U.S. currency. On or about August 17, 2024, Jalen Brent filed a claim to the seized currency in the administrative forfeiture proceeding, asserting that he was using the seized currency "to start a business with vending or a small box truck because a friend . . . got into it and [told Brent] the best ones were in California."

19. Based on the information provided in this Affidavit, affiant believes that the seized currency was furnished or intended to be furnished in exchange for controlled substances, represents proceeds traceable to such an exchange, or was intended to be used to facilitate the illegal sale of narcotics and is, therefore, subject to seizure and forfeiture to the United States of America pursuant to 21 U.S.C. § 881(a)(6).

6

I declare under penalty of perjury, as provided by federal law, that the foregoing statements are true. Further your affiant sayeth naught on this the 13TH day of NOVEMBER, 2024.

_____
Nicholas Nimeskern, Task Force Officer
Drug Enforcement Administration